UNITED STATED DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JACLYN PISCITELLI<br>    Plaintiff | :<br>:<br>: |
| Vs. | :<br>: |
| UNIVERSITY OF SAINT JOSEPH<br>    Defendant | :    OCTOBER 9, 2019<br>:<br>: |

## COMPLAINT

### INTRODUCTION

1. This is an action for money damages, costs, attorneys' fees and other relief as a result of Defendant's violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et. seq.*

### JURISDICTION

2. Jurisdiction is based on the existence of a federal question pursuant to 28 U.S.C. § 1332.

### PARTIES

3. Plaintiff, Jaclyn Piscitelli is a resident of the state of Connecticut who resides at 59 Mohawk Street, New Britain, CT 06053.

4. Defendant University of Saint Joseph ("Defendant" or "USJ") is an institution of higher education, located at 1678 Asylum Avenue, West Hartford, CT 06117. At all times relevant to this complaint, Defendant employed more than 15 employees.

1

5. Defendant is an educational institution, as defined in 20 U.S.C. §1687, that receives Federal financial assistance.

**FACTS**

6. Plaintiff began her employment with Defendant on or about June 14, 2011 as Assistant Registrar.
7. In 2015, Plaintiff was hired into the position of Associate Athletic Director.
8. As Associate Athletic Director, Plaintiff reported to Defendant's Athletic Director Bill Cardarelli, a male ("Cardarelli").
9. Cardarelli held the position of Athletic Director at all relevant times to this action. Cardarelli stepped down from the position and a new Athletic Director was hired effective June 24, 2019.
10. Throughout Plaintiff's employment with Defendant, she performed her job duties and responsibilities diligently and completely and consistently received positive performance evaluations.
11. Plaintiff's lifelong dream and goal was to have a career in athletics at the collegiate level and to work as an Athletic Director at a college or university.
12. Plaintiff's employment as Associate Athletic Director represented a significant achievement toward her professional goals. Plaintiff was passionate about her job and devoted a great deal of her energy and focus to excelling in her work performance.
13. In June 2017, Defendant announced that it would begin admitting males to its undergraduate programs for the 2018-2019 academic year.
14. Prior to the fall of 2018, Defendant admitted only female undergraduate students.

15. Prior to academic year 2018-2019, Defendant's intercollegiate athletics program was comprised exclusively of women's sports teams.

16. The transition of Defendant's undergraduate programs to coeducational resulted in the creation of men's athletic teams and the hiring of coaching staff for these new men's teams.

17. In September 2018, Defendant hired James A. "Jim" Calhoun, a male ("Calhoun"), as Head Coach of Defendant's new men's basketball team. Calhoun had previously been employed as Head Coach of the University of Connecticut men's basketball team from 1986 until September 2012, during which time that program came to national prominence and Calhoun became a celebrity.

18. Defendant gave Calhoun and his team preferential treatment including by diverting resources from women's sports to do so.

19. In September 2018, Defendant hired Glen Miller, a male, ("Miller") as Assistant Coach of Defendant's new men's basketball team.

20. Miller was hired at the request of Calhoun. Miller had previously worked as an assistant coach to Calhoun prior to Calhoun's retirement.

21. In her position as Associate Athletic Director under Cardarelli, Plaintiff performed numerous duties and responsibilities of the Athletic Director, as Cardarelli was spending less time working prior to his retirement from the position.

22. Beginning almost immediately after Calhoun and Miller began their full-time employment with Defendant, the athletic department became a male-dominated, hostile work environment.

23. Throughout the 2018-2019 academic year, Plaintiff had regular monthly one-on-one meetings with Defendant's Vice President of Student Affairs, Ken Bedini, who is male, "(Bedini") to discuss issues related to the athletic department and Defendant's athletic programs.

24. Plaintiff reported unfair treatment she had suffered since the Athletic Department had become a male-dominated environment to Bedini on numerous occasions throughout the 2018-2019 academic year.

25. Defendant permitted Calhoun and Miller to transform the work environment in the athletic department to one that was openly hostile and disdainful toward women and where women were treated as second class citizens.

26. Following the hiring of Calhoun and Miller, Plaintiff was treated differently and less favorably than similarly situated male employees, was excluded from participation in activities and denied benefits provided to male employees.

27. Prior to the 2018-2019 academic year, Plaintiff had a private office.

28. Beginning in the fall of 2018, Plaintiff was forced to share her office with two newly-hired male coaches.

29. Beginning in fall 2018, Plaintiff's male co-workers would frequently leave work to play golf with Calhoun during the workday, while Plaintiff remained at the office.

30. Plaintiff told Bedini that the males in the department would go off to play golf during the workday while she remained at the office.

31. In her position as Associate Athletic Director, Plaintiff held the role of Defendant's NCAA Compliance Coordinator. In this role, Plaintiff was required to participate in weekly conference calls which were required to be confidential.

32. Prior to the fall of 2018, Plaintiff was able to participate in these calls from her private office.

33. However, once Plaintiff was required to share her office with two new male employees beginning in the fall of 2018, she was prevented from performing this function of her position in her office.

34. Plaintiff asked Cardarelli where she could go to take these calls given the confidential nature of them and her now-shared office. In response, Cardarelli told Plaintiff to work in a locker room and take the calls there.

35. When Plaintiff then tried to discuss the situation further with Cardarelli and requested to work from home for the short time each week she needed to be on the NCAA Compliance conference, he walked out of the office, while Plaintiff was still speaking to him, so he could introduce his daughter to Calhoun.

36. The addition of numerous new athletic teams in 2018 resulted in a significantly increased workload for Plaintiff. Plaintiff requested assistance but was refused, contrary to the treatment afforded to a similarly situated male employee.

37. In November, 2018, after Plaintiff had requested assistance and had been refused it, Josh Ingham, a male, ("Ingham") who held the position of Sports Information Director with Defendant in its Athletic Department, Ingham was granted a twenty (20) hour per week assistant, in addition to an intern and a Graduate Assistant ("GA") to assist him.

38. Plaintiff made requests of Cardarelli and Bedini on multiple occasions in the fall of 2018 to discuss her workload and to request assistance. Despite her requests, including a formal request for a GA, Plaintiff was given no assistance.

39. Despite being provided with significant assistance and resources, Ingham routinely failed to meet deadlines or to complete his work responsibilities.

40. Plaintiff was treated less favorably than Ingham, including with regard to staff and GA support.

41. During the 2018-2019 academic year, Ingham regularly failed to write and post post-game stories related to women's sports in a timely manner, giving priority to men's sports. Though Defendant's administration was aware of this, no action was taken against Ingham. On one occasion, the coach of the women's swim team, a female, complained that no post-meet story had been written about her team. Cardarelli was dismissive toward this coach and later stated that she "needs to calm down."

42. Plaintiff advised Bedini of Ingham's failure to perform his responsibilities relative to women's sports to no avail.

43. During this time of increased work load and the decline of Cardarelli's involvement, Plaintiff was under an enormous amount of stress due to her job and work environment. She was working almost constantly with little time off, at one point working 23 consecutive days.

44. Plaintiff had also worked 6 to 7 days a week for months before this without earning any comp time.

45. Due to the stress and medical symptoms she was experiencing, Plaintiff sought treatment with both her primary care physician and cardiologist for emotional distress.

46. Bedini was aware that Plaintiff was performing aspects of Cardarelli's job in addition to her own. During one of their monthly meetings, Plaintiff specifically discussed Cardarelli's failure to perform the duties and responsibilities of the Athletic Director position which resulted in Plaintiff having to perform those duties and responsibilities.

47. Shortly after becoming full-time employees at USJ, Calhoun's and Miller's treatment of Plaintiff became increasingly hostile and belittling.

48. Calhoun consistently and repeatedly told Plaintiff to open his office door for him, even when he had his office keys in his hands, and without so much as a simple "hello".

49. There was an instance in which Calhoun knocked a number of single-serve coffee "K-cups" onto the floor and stepped on them, creating a mess of coffee grounds and packaging on the floor and made Plaintiff clean them up, stating that if he made such a mess at home, his wife would clean up after him.

50. Cardarelli, who witnessed the K-cup incident, expressed to Plaintiff that he found the situation amusing and that he did not see anything wrong with Calhoun's behavior. Cardarelli further asked Plaintiff, who Cardarelli was aware is not married, whether she would clean up after her husband in similar circumstances.

51. On another occasion, Calhoun made a statement to Plaintiff, "Well, you're certainly hot": using "hot" in its slang usage to mean physically or sexually attractive.

52. Miller also made numerous inappropriate comments to Plaintiff, including criticizing her for not being cheerful or smiling enough.

53. On one occasion when Plaintiff had a serious, professional demeanor, Miller said to her "I'd swipe left too." Miller's statement was a reference to the popular dating app "Tinder", in which users may swipe left to reject further contact with another user or swipe right to indicate sexual or romantic interest in another user.

54. Plaintiff felt this comment went too far and was too personal and considered reporting it to Defendant's Human Resources department, but feared retaliation, particularly given Miller's affiliation with Calhoun, who was favored and fawned over by Defendant's administrators because of his celebrity status.

55. Plaintiff reported the inappropriate and sexually harassing comments of Calhoun and Miller to Cardarelli. No action was taken by Defendant in response to Plaintiff's complaints.

56. In October 2018, during a meeting in which Miller, Plaintiff and Bedini were present, Miller expressed complaints about being expected to participate and having his team participate in "Midnight Madness", an event coordinated by Plaintiff. Miller falsely claimed that he had not been informed of the Midnight Madness event, implying that Plaintiff had failed to perform her duties.

57. Plaintiff had previously sent Miller emails regarding the event and meeting invitations to discuss the event directly. Miller failed to respond or even acknowledge Plaintiff's communications.

58. When Plaintiff discussed this with Miller after the meeting, Miller stated that he never read any of Plaintiff's emails about the event or about anything else.

59. Plaintiff complained to Bedini about Miller's conduct toward her related toward the Midnight Madness event.

60. On two separate occasions in meetings, Miller asked Plaintiff questions he already knew the answers to and then interrupted Plaintiff while she was answering his questions.
61. Plaintiff complained to Bedini about Miller interrupting her and speaking over her in meetings.
62. On or about June 12, 2019, a meeting was held for the purpose of bringing the incoming Athletic Director up to speed on a broad range of issues related to athletics. This meeting was attended by a large proportion of athletic staff, including Plaintiff and Miller. During the meeting, Miller asked a question directed at Plaintiff and again interrupted her as she was answering. After the meeting, Miller approached Plaintiff and said "you're feisty, I like it", implying this turned him on sexually, and then proceeded to attempt to engage Plaintiff in play fighting by putting his fists up while asking "do you want to fight me?"
63. In late March 2019, it came to light that certain Title IX compliance requirements that were the responsibility of Defendant's Athletic Director had not been performed by Cardarelli as required. Defendant's administration contacted Cardarelli about his failure to perform certain compliance measures. Cardarelli deflected responsibility and directed Plaintiff and Mary Cooper ("Cooper') to "fix this." Plaintiff had previously advised Defendant's Director of Human Resources, Deb Spencer ("Spencer") of Cardarelli's neglect of his job duties, particularly those that related to maintenance of and compliance with policies.
64. On or about March 27, 2019, Plaintiff spoke to Spencer, regarding Cardarelli's failure to perform his duties relative to Title IX compliance and his insistence that

Plaintiff "fix" situations resulting from this failure. Spencer's response was "I know, but there is nothing I can do."

65. Plaintiff reported to Bedini that male staff and coaches routinely ignored her and would only communicate with Mr. Ingham or other male employees instead of Plaintiff regarding matters within Plaintiff's job duties.

66. In or about late May, early June 2019, Calhoun called Plaintiff into his office to complain about Cooper. In this conversation, Calhoun twice referred to Cooper, the only female employee working in the Athletic Department office other than Plaintiff, as a "bitch" and said "when Mary asks me what to do with work I hand her, I want to tell her to 'shove it up her ass.'" Calhoun went on to say he was ready to go to Defendant's President to have Cooper fired.

67. Plaintiff promptly informed Cardarelli and Bedini of what Calhoun said regarding Cooper. Plaintiff told Bedini she was informing him so that someone was aware of Calhoun's behavior and to seek his advice regarding Calhoun's comments about Cooper.

68. During the spring 2019 semester, Plaintiff stated to Bedini that the Athletic Department had become a "boys club".

69. During the 2018-2019 academic year, Plaintiff stated to Cardarelli that the athletic department and the office environment had become a "boys club" since the arrival of Calhoun and Miller.

70. Bedini took no action to investigate or remedy Plaintiff's numerous complaints and reports related to the negative and hostile treatment toward women in the athletic department and related to the male-dominated sexist atmosphere that

had become pervasive over the 2018-2019 academic year. Instead, Bedini ignored and brushed aside Plaintiff's complaints, reacting in such a way as to suggest that Plaintiff was causing trouble by opposing sexist conduct in the workplace.

71. During the spring 2019 semester, Plaintiff expressed to Bedini that she was considering seeking other employment because her working environment had become almost intolerable given the "boys club" atmosphere that had taken over.

72. Rather than taking any action to remedy the hostile work environment, Bedini instead told Plaintiff that she had "better not be [at USJ] come the fall" and on another occasion said that she "better not fucking be here [the following academic year]".

73. On June 21, 2019, Plaintiff was summoned to a meeting with Spencer and Bedini in which she was informed that her employment was terminated effective immediately.

74. After being informed of the termination of her employment, Plaintiff asked if she had done something wrong. Bedini responded "no, we're moving in a new direction."

75. On the same day of Plaintiff's termination, June 21, 2019, Ingham was promoted to Assistant Athletic Director.

76. On July 11, 2019, Plaintiff's position was posted on Defendant's website as an open position.

77. Defendant has since hired a male to replace Plaintiff.

## **COUNT ONE: TITLE IX RETALIATION IN VIOLATION OF 20 U.S.C. §1681(a) et. seq.**

78. Plaintiff engaged in activity protected by law pursuant to 20 U.S.C. §1681(a) *et. seq*. Specifically, Plaintiff engaged in protected activity when she reported discriminatory conduct toward women, harassment of a sexual nature, and harassment on the basis of sex to her supervisor, to Defendant's Human Resources department, and to Defendant's Vice President for Student Affairs.

79. Defendant was aware of Plaintiff's protected activity.

80. Defendant ignored Plaintiff's reporting of unfair treatment on the basis of sex as demonstrated above and failed to take action or to investigate her complaints.

81. Defendant subjected Plaintiff to adverse action, including but not limited to the termination of her employment, in retaliation for Plaintiff engaging in protected activity.

82. Defendant retaliated against Plaintiff in violation of 20 U.S.C. §1681(a) *et. seq.* when it terminated her employment.

83. As a direct result of Defendant's violation of 20 U.S.C. §1681(a) *et. seq.,* Plaintiff has suffered loss of wages and benefits, past and future, and has suffered non-economic damages in the nature of emotional distress and loss of enjoyment of life's activities. Plaintiff has also incurred attorneys' fees and costs in vindicating her rights under law.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff claims A TRIAL BY JURY and judgment against Defendant as follows:

1. Compensatory damages for economic loss of wages and benefits of employment pursuant to 20 U.S.C. § 1681(a) *et seq*. and federal common law;
2. Equitable relief in the form of back pay and reinstatement pursuant to 20 U.S.C. § 1681(a) *et seq*. and federal common law;
3. Compensatory damages for non-economic loss of harm to reputation, emotional distress, loss of enjoyment of profession, and loss of enjoyment of life pursuant to 20 U.S.C. § 1681(a) *et seq*. and federal common law;
4. Punitive damages pursuant to pursuant to 20 U.S.C. § 1681(a) *et seq*. and common law;
5. Attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988 ;
6. Pre-judgment interest; and
7. Such other further and different relief as this Court may deem just and equitable.

PLAINTIFF,
JACLYN PISCITELLI

By:   /s/Magdalena B. Wiktor
Magdalena B. Wiktor (ct28647)
Jacques J. Parenteau (ct09771)
Madsen, Prestley & Parenteau, LLC
105 Huntington Street
New London, CT 06320
Tel: (860) 442-2466
Fax: (860) 447-9206
E-mail: mwiktor@mppjustice.com
           jparenteau@mppjustice.com
Attorneys for the Plaintiff